# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

PAULA M. PAGLIARONI,

        Plaintiff,

v.                                 CASE NO. 04-C-1213

DAIMLER CHRYSLER CORPORATION,

        Defendant.

---

## DECISION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

On December 20, 2004, Paula M. Pagliaroni ("Pagliaroni") filed a complaint against her former employer, Daimler Chrysler Corporation ("DC"), alleging that DC failed to comply with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq. This case was randomly assigned to this court and all parties have consented to the full jurisdiction of a magistrate judge.

Pagliaroni alleges that she is disabled because of occupational asthma and anaphylaxis, and that DC failed to accommodate her disability and retaliated against her. On January 31, 2006, after a period of discovery, DC filed a motion for summary judgment. The pleadings on DC's motion for summary judgment are now closed and the matter is ready for resolution.

## FACTUAL SUMMARY

Pagliaroni was employed by DC and its predecessor companies since 1974 as a production / assembly worker at its engine plant in Kenosha, Wisconsin. (Pagliaroni Dep. 8, 12-13.) In 2002, Pagliaroni was working in Department 830 assembling 2.7 liter engines. (Pagliaroni Dep. 14-15.) In January of 2002, at a town hall-style meeting where employees were given the opportunity to ask

1

questions and express complaints to management, several employees complained about the air quality inside the Kenosha engine plant. (Pagliaroni Dep. 63-64.) On February 27, 2002, Pagliaroni became ill at work, complaining that her throat felt restricted and of a burning sensation on her face. (Pagliaroni Dep. 64.) After going to the company's medical department, Pagliaroni was released on February 27 to go see her own doctor. (Pagliaroni Dep. 65.) Pagliaroni did not return to work following this incident and on April 3, 2002, she was notified by way of a letter that she had been terminated for her failure to provide DC with a reason for her absence. (Pagliaroni Dep. 99; Pagliaroni Dep. Ex. 4, p. 3.) Pagliaroni was given seven days to respond to the letter, which she did by submitting two doctor's notes. (Pagliaroni Dep. 99.) On June 24, 2002, Pagliaroni signed a Conditional Seniority Restoration form, which stated that she was reinstated effective June 19, 2002, and she agreed that she was properly terminated on February 27, 2002 for being absent for five days without leave. (Pagliaroni Dep. 99; Pagliaroni Dep. Ex. 4, p. 4.) Pagliaroni alleges that she signed this document under duress. (Pagliaroni Dep. 103.)

On March 14, 2002, upon the recommendation of coworker, Pagliaroni saw Dr. Jordan Fink. (Pagliaroni Dep. 66-68.) Prior to her reinstatement, Pagliaroni twice met with the DC medical staff. According to the notes of DC's medical staff, on May 3, 2002, Pagliaroni stated that Dr. Fink had diagnosed her with anaphylaxis and industrial asthma. (Pagliaroni Dep. Ex. 12, p. 6.) Additionally, Pagliaroni stated that she suffered symptoms only at work and that merely going to a meeting in a human resources conference room caused her to experience symptoms. (Pagliaroni Dep. Ex. 12, p. 6.) On June 11, 2002, Pagliaroni again saw DC medical staff and the notes from this visit indicate that on May 1, 2002 a doctor recommended that for one month Pagliaroni "work in a restricted area" which was then followed by a question mark in parentheses. (Pagliaroni Dep. Ex. 12, p. 6.)

On June 25, 2002, Pagliaroni reported to DC's medical department complaining of difficulty breathing, a burning sensation in her chest, and a dry cough. (Pagliaroni Dep. Ex. 12, p. 6.)

Pagliaroni stated that Dr. Fink told her to remain off work through September 1, 2002 but she was ignoring that recommendation. (Pagliaroni Dep. Ex. 12, p. 6.) Pagliaroni complained of similar symptoms to DC's medical staff on June 27, 2002. (Pagliaroni Dep. Ex. 12, p. 6.)

On July 16, 2002, Pagliaroni filed a grievance in which she complained that the plant doctor would not honor the physical restrictions placed on her by her own doctor. (Pagliaroni Dep. Ex. 4, p. 5.)

On July 17, 2002, Pagliaroni again reported to DC's medical department complaining that she was having a hard time breathing. (Pagliaroni Dep. Ex. 12, p. 1.) Pagliaroni stated that someone was smoking near her. (Pagliaroni Dep. Ex. 12, p. 1.) The notes further indicate that Pagliaroni was upset about people smoking by her and that she was being harassed because of her complaints regarding people smoking. (Pagliaroni Dep. Ex. 12, p. 1.)

Also on July 17, 2002, Pagliaroni filed a grievance alleging that she alerted her supervisor of two employees smoking and that she had trouble breathing when she was nearby people smoking, and her supervisor failed to stop the employees from smoking. (Pagliaroni Dep. Ex. 4, p. 6.) DC's smoking policy at the Kenosha Engine Plant prohibited smoking in all work areas and permitted smoking only in designated areas. (French Dep. 15-16.) In response to complaints that the smoking policy was being violated in Department 830, Brian French, a labor relations supervisor at the Kenosha Engine Plant, instructed a supervisor to enforce the policy, reposted the smoking policy, met with the manager of Department 830, and met with a union representative. (French Dep. 20, 22-23.)

Pagliaroni did not return to work until April 1, 2003. (Pagliaroni Dep. Ex. 6.) A medical release filled out by Dr. Fink indicates that Pagliaroni's "final and complete diagnosis" was occupational asthma and anaphylaxis, and that she was able to return to work on April 1, 2003 but was restricted for five years to working on lines 730, 731, or 733 or in DC's Milwaukee or Orlando

3

parts depots. (Pagliaroni Dep. Ex. 6.) Dr. Fink restricted Pagliaroni to Departments 730, 731, or 733 because he believed that they were low vapor areas. (Fink Dep. 17, 31.) Dr. Fink did not know if Department 830 was a no vapor area. (Fink Dep. 31.) However, Departments 730 and 830 are both classified by DC as "no vapor areas." (French Dep. 43; Melvin Dep. 56-57.)

Prior to her returning to work, Pagliaroni met with DC's medical staff on March 27, 2003. The notes from this visit indicate that Pagliaroni had previously met with two doctors, neither of whom diagnosed her with her with any occupational injury, medical condition, asthma, or allergic reaction. (Pagliaroni Dep. Ex. 12, p.1.) However, both diagnosed her with vocal cord dysfunction and one diagnosed her with anxiety whereas the other diagnosed her with morbid obesity. (Pagliaroni Dep. Ex. 12, p.1.)

Pagliaroni returned to work and on April 11, 2003, a machine in Department 830 malfunctioned, filling the department with smoke. (Pagliaroni Dep. 123; Pagliaroni Dep. Ex. 7.) As a result of this incident, Pagliaroni reported to DC's medical department and complained of difficulty breathing, irritation in her throat and eyes, and a cough. (Pagliaroni Dep. Ex. 12, p.1.) Pagliaroni was then released from work to go see Dr. Fink. (Pagliaroni Dep. 124.)

Pagliaroni presented to DC two notes from Dr. Fink. The first one indicates that Pagliaroni is to remain off work from April 14 through April 23, 2003 and should return on April 24 to Departments 730, 731, 733, or the Milwaukee or Orlando parts depots. (Pagliaroni Dep. Ex. 8, p.2.) The second note, dated April 24, 2003, states that Pagliaroni may return to work on July 14, 2003. (Pagliaroni Dep. Ex. 8, p.1.) This notice indicates that Pagliaroni is unable to return to work in Department 830, that she must avoid the unknown irritants that are aggravating her respiratory system, and that she "must return to work in <u>LOW VAPOR AREA</u>." (Pagliaroni Dep. Ex. 8, p.1) (emphasis in original). This notice further indicates that these limitations apply for two years. (Pagliaroni Dep. Ex. 8, p.1.)

On June 23, 2003, Pagliaroni filed a discrimination complaint with the Wisconsin Department of Workforce Development Equal Rights Division ("ERD") alleging that she was discriminated against because of her disability of industrial asthma. (Pagliaroni Dep. Ex. 3.) In this complaint, Pagliaroni refers only to smoke in the workplace and seeks that DC either transfer her or enforce its no smoking policy. (Pagliaroni Dep. Ex. 3.)

Pagliaroni does not recall when she returned to work following the April 11, 2003 incident, but by September of 2003, she was back at work and transferred to Department 730. (Pagliaroni Dep. 123.) On September 11, 2003, Pagliaroni reported that she came in contact with machining coolant and this caused her irritation to her throat and skin. (Pagliaroni Dep. Ex. 9.) On September 23, 2003, DC sent a letter to Pagliaroni stating that had been absent from work since September 11, 2003 and stating that a reason for this absence had never been established. (Pagliaroni Dep. Ex. 10.) Pagliaroni was instructed to provide a reason for her absence by September 30, 2003 and informed that failure to do so would result in her seniority being terminated. (Pagliaroni Dep. Ex. 10.) On September 24, 2003, Dr. Fink filled out a medical release form and stated that Pagliaroni would be able to return to work on October 6, 2003 but was unable to work in Department 830 and must work in a low vapor area and avoid coolants and irritants. (Pagliaroni Dep. Ex. 12, p.12.)

While working in Department 730, Pagliaroni experienced at least two incidents of asthma or anaphylaxis. The first occurred when Pagliaroni came in contact with auto parts that had a chemical on them. (Pagliaroni Dep. 141-43.) As a result of this incident, Pagliaroni went to the emergency room after work, but this incident did not result in her missing any work. (Pagliaroni Dep. 142.) She also experienced a reaction as a result of people smoking nearby her; however, she did not seek any medical attention as a result of this incident but instead continued to work. (Pagliaroni Dep. 143.)

On October 21, 2003, Pagliaroni reported to DC's medical department complaining of pain in her hands. (Pagliaroni Dep. Ex. 12, p.3.) She was diagnosed with carpal tunnel syndrome and moved to an office clerical position.

While working in the clerical position, Pagliaroni was told to go and work in Department 830 because DC needed help in that department. (Pagliaroni Dep. 164.) Pagliaroni told her supervisor that her doctor instructed that she not work in that department, but her supervisor told her that DC's doctor said that Pagliaroni could work in the department. (Pagliaroni Dep. 164.) While working in Department 830, Pagliaroni began to lose her voice, which she states is one of her first symptoms an allergic reaction. (Pagliaroni Dep. 164.) However, Pagliaroni did not experience any shortness of breath. (Pagliaroni Dep. 164.) Pagliaroni felt that DC would continue to place her in Department 830, and she felt this was dangerous to her. (Pagliaroni Dep. 164.) Therefore, Pagliaroni chose to resign and take early retirement at age fifty-two. (Pagliaroni Dep. 135, 163-64.) Pagliaroni had planned on working for DC until she reached age fifty-five. (Pagliaroni Dep. 135.) This early retirement resulted in decreased retirement benefits for Pagliaroni. (Pagliaroni Dep. 135.)

## SUMMARY JUDGMENT STANDARDS

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgement as a matter of law. FED. R. CIV. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## ANALYSIS

### FAILURE TO ACCOMMODATE

Employers are required to accommodate the disability of an otherwise qualified individual, provided such accommodation would not impose an undue hardship upon the employer. 42 U.S.C. § 12112(b)(5)(A); Hoffman v. Caterpillar, Inc., 256 F.3d 568, 572 (7th Cir. 2001). The plaintiff must demonstrate that she is an otherwise qualified individual with a disability, that her employer was aware of her disability, and that her employer failed to accommodate it. Hoffman, 256 F.3d at 572; EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005). "As to the third element, the 'ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation.'" Sears, 417 F.3d at 797 (quoting Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998)). Reasonable accommodations may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

7

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

In the present case, DC presents three arguments as to why summary judgment is appropriate regarding Pagliaroni's claims that DC violated the ADA by failing to accommodate her disability. First, DC argues that Pagliaroni is not disabled within the meaning of the ADA. Second, DC argues that Pagliaroni cannot perform her job with a reasonable accommodation. Finally, DC argues that Pagliaroni suffered no adverse employment actions as a consequence of any failure to accommodate. For the reasons set forth below DC's motion for summary judgment regarding Pagliaroni's claims that DC failed to accommodate her disability shall be denied.

### Disability

A person is disabled under the ADA if he or she has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2); 29 C.F.R. 1630.2(g). The components of this definition are then further defined. The parties dispute what major life activity Pagliaroni's impairments affect. The parties agree that these impairments affect Pagliaroni's ability to breathe, but DC argues that Pagliaroni's impairments do not affect her ability to breathe generally, but are limited to her ability to breathe within a work environment. Therefore, DC submits that if plaintiff's substantial life activity is limited to work, Pagliaroni does not qualify as disabled under the ADA.

For the purposes of this motion, DC does not dispute that Pagliaroni has asthma and anaphylaxis and these conditions constitute a physical impairment that affects the major life activity of breathing. However, DC argues that Pagliaroni's impairments do not affect Pagliaroni's ability to breathe generally but rather only impair her ability to breathe at work, specifically at DC's Kenosha

Engine Plant. Thus, DC argues, Pagliaroni can demonstrate only that she is unable to perform certain assembly jobs at DC, but is not unable to perform non-skilled work generally and therefore she is not disabled under the ADA. See Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 200-201 (2002).

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. 1630.2(I). The plaintiff bears the burden of presenting evidence to demonstrate that her impairment precludes a class of jobs. Webb v. Clyde L. Choate Mental Health & Dev. Ctr., 230 F.3d 991 (7th Cir. 2000).

Whether Pagliaroni's breathing impairments are limited to work, or whether they extend to other major areas of her life are factual disputes that preclude summary judgment in this case. Thus, it is for a jury to determine the extent of Pagliaroni's breathing impairments.

There is evidence in the record that indicates Pagliaroni's impairments affect only her ability to work in Department 830 and thus supports the conclusion that she is not disabled under the ADA. On the other hand, there is also evidence to suggest that Pagliaroni's impairments affect her ability to breathe generally and in a wide variety life-contexts, and thus indicates that she is disabled under the ADA. Supporting the conclusion that Pagliaroni is limited from working only in Department 830 are her allegations that she worked without problems in Department 730 and the office at the Kenosha Engine Plant and her and her doctor's assertions that she could have worked in the Milwaukee or Orlando parts depots. However, Pagliaroni and DC both present evidence that contradicts the conclusion that Pagliaroni's impairments are limited to Department 830. For example, DC disputes that Pagliaroni did not suffer any acute attacks of asthma or anaphylaxis after she began work in Department 730. (Def. Resp. to Pl.'s Prop. Find. Fact 218.) Although the

9

incidents may not be accurately described as "acute," nonetheless, Pagliaroni testified that she suffered at least two reactions while working in Department 730, (Pagliaroni Dep. 141-43), and thus there is evidence to suggest that Pagliaroni's impairments may have substantially affected her ability to work generally and not only specifically in Department 830.

As additional support for the conclusions that Pagliaroni was either substantially limited in her ability to work or substantially limited in her ability to breathe generally, there are the additional facts that Pagliaroni presents regarding her impairments. For example, DC does not dispute that Pagliaroni's further limitations include an inability to do hard physical labor, an inability to use cleaners, an inability to go near swimming pools or hot tubs, an inability to snorkel or scuba dive, (Pl.'s Prop. Find. Fact 226), an inability to sing or recite nursery rhymes, (Pl.'s Prop. Find. Fact 190), an inability to spray fruit trees with chemicals, (Pl.'s Prop. Find. Fact 193), and a sensitivity to smoke, (Pl.'s Prop. Find. Fact 25).

Therefore, material factual disputes exist as to whether Pagliaroni is disabled under the Act and thus summary judgment on this basis is inappropriate.

### Reasonable Accommodation

As an alternative basis for summary judgment, DC argues that Pagliaroni was unable to perform her job with a reasonable accommodation and therefore is not entitled to relief under the ADA. The ADA requires that covered entities make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

DC does not dispute that Pagliaroni and other employees had complained of respiratory ailments as a result of airborne contaminants in the Kenosha Engine Plant. It is also undisputed that

10

DC spent millions of dollars in an effort to improve the indoor air quality at the Kenosha Engine Plant. It is DC's perspective that transferring Pagliaroni would have been unnecessary and thus an unreasonable accommodation because Pagliaroni was merely requesting to work in a "no vapor area," when she was, in fact, already working in a no vapor area. DC alleges that Pagliaroni merely had her doctor list the specific departments in which she wanted to work. Therefore, DC had no obligation to comply with Pagliaroni's request because a person seeking an accommodation under the ADA is not entitled to the specific accommodation she desires. See Emerson v. N. States Power Co., 256 F.3d 506, 515 (7th Cir. 2001) (citing Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996)).

There is the question of whether a transfer to another "no vapor area" would have been a reasonable accommodation. This is a disputed material fact and therefore summary judgment is inappropriate. Although DC may classify Departments 730 and 830 as equivalent no vapor areas, DC's classifications may not coincide with Pagliaroni's hypersensitivities. This court is unable to determine if all no vapor areas are substantially identical. Pagliaroni provides two distinctions between Departments 730 and 830. First, Department 730 has a pneumatic tool that uses oil, but Department 830 does not. (Pl.'s Prop. Find. Fact 159.) Second, machining is done in enclosed machines in Department 730 whereas in 830 the machines are not enclosed. Based upon these distinctions, a reasonable inference can be drawn that a different, but similarly classified, department may have been suitable for Pagliaroni.

DC's alleged failure to enforce its smoking policy is an additional reason as to why summary judgment is inappropriate. It is undisputed that the extent of DC's efforts regarding the enforcement of smoking policy was to speak with Pagliaroni's supervisor, notify the plant's industrial hygienist of the complaints, meet with union representatives, and re-post the policy. There is a material factual dispute as to whether these efforts can be characterized as enforcement.

From the record, at no point did DC ever attempt to enforce its smoking ban by disciplining violators. Therefore, a jury issue has been raised as to whether enforcement of DC's pre-established policies would have constituted a reasonable accommodation, and if so, was the action taken by DC sufficient.

### Adverse Employment Action

Finally, DC argues that summary judgment should be granted because Pagliaroni suffered no adverse employment action so as to constitute discrimination. Although both parties present adverse employment action as an element of a discrimination claim under the ADA, neither cite any authority for this proposition aside from the plaintiff's citation to the ADA in its entirety. Courts in this district have recognized that a party alleging a claim for failure to accommodate is not required to allege an adverse employment action. Wade v. DaimlerChrysler Corp., 418 F. Supp. 2d 1045 (E.D. Wis. 2006) (citing cases). "The failure to accommodate is itself an act of discrimination that violates the ADA." Id. (citing 42 U.S.C. § 12112(b)(5)(A)). Therefore, DC is not entitled to summary judgment on the basis that Pagliaroni may not be able to demonstrate that she suffered an adverse employment action, because Pagliaroni is not required to prove such adverse action to be entitled to relief under the ADA.

### RETALIATION

The ADA sets forth the following anti-retaliation provision:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

An employee bringing an ADA retaliation claim may present either direct evidence of discrimination or indirect evidence under the burden-shifting method set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Kersting v. Wal-Mart Stores, Inc., 250 F.3d 1109, 1117 (7th

Cir. 2001) (citing Silk v. City of Chicago, 194 F.3d 788, 799 (7th Cir. 1999)). An employee bringing an ADA retaliation claim based upon indirect evidence must first present a prima facie case of retaliation by demonstrating that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action. Id.; see also Wade, 418 F. Supp. 2d at 1051.

Pagliaroni alleges that DC retaliated against her "by sending termination letters after the date they wanted her to come in and the harassment." (Pl.'s Prop. Find. Fact 230.) In her brief opposing summary judgment, Pagliaroni also alleges that DC retaliated against her by failing to accommodate her disability. DC argues that Pagliaroni has failed to present a prima facie case of retaliation because she has not demonstrated that she suffered any adverse action.

"An employee claiming retaliation must show that he suffered a 'materially adverse employment action." McDonnell v. Cisneros, 84 F.3d 256, 258 (7th Cir. 1996). Adverse employment action has been broadly defined in the Seventh Circuit and can encompass many forms of adversity. Silk, 194 F.3d at 800.

Although Pagliaroni does not set forth specifically what actions she considers to constitute the element of adverse employment action, Pagliaroni does allege that she was terminated in retaliation for her request for an accommodation. Termination is obviously an adverse employment action. In response, DC contends that any claims relating to her termination were waived when Pagliaroni agreed to the conditional seniority restoration and cites Baker v. Potter, 2005 WL 843169, *14 (N.D. Ill. 2005), in support of its position. However, Baker is readily distinguishable. The language of the settlement agreement executed in Baker "unambiguously waived her rights to *all* claims." Id. (emphasis in original). The conditional seniority restoration agreement executed in this case contains no such explicit waiver. (Pagliaroni Dep. Ex. 4, p. 4.) The agreement merely waives Pagliaroni's claims to retroactive wages or benefits for the period she did not work; it is

silent regarding other claims. Although the agreement states that Pagliaroni agrees that she was properly terminated for being absent for five days without leave, there is no explicit waiver of other potential claims. The Seventh Circuit has made clear that an employee may not cede substantive rights guaranteed under federal law, such as the ADA, absent a knowing and voluntary waiver. See Gibson v. Neighborhood Health Clinics, 121 F.3d 1126, 1129 (7th Cir. 1997). In the present case, there is no indication that the conditional seniority restoration agreement could be considered a waiver of her substantive rights under the ADA and certainly not a knowing one. Therefore, DC's challenge to Pagliaroni's prima facie case must fail.

Having established a prima facie, a presumption of retaliation arises. Nawrot v. Cpc Int'l, 277 F.3d 896, 905 (7th Cir. 2002) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). It is then DC's burden to demonstrate a legitimate, non-retaliatory reason for its action. Id. However, DC has made no such effort and thus this court must deny DC's motion for summary judgment regarding Pagliaroni's claims of retaliation based on her termination.

Pagliaroni also argues that she was retaliated against by DC's failure to prevent harassment by her co-workers, by DC medical staff's refusal to allow her to leave to go see her own doctor, and by not accommodating her disability.

Pagliaroni cites no authority for the proposition that an employer's failure to accommodate an employee's disability can be considered retaliation. If this court were to accept Pagliaroni's argument, almost every failure to accommodate claim would be simultaneously a retaliation claim. The court finds that it was unlikely Congress' intent to provide plaintiffs redundant relief for the same conduct when it established the anti-retaliation provisions of the ADA. Therefore, Pagliaroni's claim of retaliation on this basis may not proceed.

Additionally, Pagliaroni presents no support for her argument that DC's alleged failure to prevent harassment by co-workers or its medical staff's refusal to allow her to leave to go see her

14

own doctor, or DC's failure to accommodate her disability, constitute adverse employment actions. Without such adverse employment action, her retaliation claims on these grounds cannot proceed. Pagliaroni may proceed on her retaliation claim exclusively on the basis that DC's termination on April 3, 2002, was retaliation for her seeking an accommodation of a disability.

## CONSTRUCTIVE DISCHARGE

While Pagliaroni was working in an office job due to restrictions as a result of carpal tunnel syndrome, she was instructed to work in Department 830. Once there, she began to experience a reaction. She felt that she would continually be required to work in Department 830 and feared the health consequences of such placement. Therefore, she decided to retire. Because she was arguably motivated by the fear of being required to return to Department 830, she submits that she was constructively discharged.

In order to prevail on a claim of constructive discharge, the plaintiff must demonstrate that the discrimination was so intolerable that resignation was an appropriate response. Rooney v. Koch Air, LLC, 410 F.3d 376, 383 (7th Cir. 2005) (citing Pennsylvania State Police v. Suders, 542 U.S. 129 (2004); McPherson v. City of Waukegan, 379 F.3d 430, 440 (7th Cir. 2004)). The employee is expected to remain at her job while seeking redress unless the conditions exceed "ordinary" discrimination. Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) (citing Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir. 1996)).

Pagliaroni essentially claims that she was constructively discharged because DC failed to accommodate her disability. Pagliaroni has failed to establish how the defendant's alleged failure to accommodate has exceeded ordinary discrimination under the ADA. She has not presented evidence that is more egregious in nature than the alleged conditions she was subjected to previously. Therefore, DC is entitled to summary judgment regarding Pagliaroni's claim of constructive discharge.

15

## WAIVER OF CLAIMS NOT RAISED IN ERD CHARGE

DC alleges that Pagliaroni waived any claims regarding DC's failure to transfer her from Department 830 to Department 730 because she did not raise this issue in her complaint to the Equal Rights Division. Rather, her ERD complaint focused upon DC's alleged failure to enforce its smoking ban.

Pagliaroni may pursue a claim not explicitly raised in her ERD complaint only if the additional allegations fall within the scope of the charged contained in her ERD complaint. Conley v. Village of Bedford Park, 215 F.3d 703, 710 (7th Cir. 2000) (quoting Cheek v. Peabody Coal Co., 97 F.3d 200, 202 (7th Cir. 1996)). An additional claim is within the scope of the earlier complaint if it is "like or reasonably related to" those raised in the original ERD complaint. Kersting v. Wal-Mart Stores, Inc., 250 F.3d 1109, 1118 (7th Cir. 2001) (quoting Conley, 215 F.3d at 710).

Pagliaroni states in her ERD complaint, "The Respondent refuses to accommodate the Complainant's disability even though it would cause no undue hardship to the Respondent to transfer the Complainant or enforce the No Smoking policy." (Pagliaroni Dep. Ex. 3). The ERD complaint is not limited to the defendant's smoking policy; it mentions a transfer, even though it fails to specify a specific department. The plaintiff's federal complaint reasonably relates to the ERD charge. DC's motion for summary judgment on the basis that Pagliaroni waived her complaint regarding DC's refusal to transfer her will be denied.

**IT IS THEREFORE ORDERED** that defendant Daimler Chrysler's motion for summary judgment shall be **denied** as to Pagliaroni's claims that DC failed to accommodate her disability. As for Pagliaroni's retaliation claim, DC's motion for summary judgment shall be **granted in part and denied in part**. Summary judgment shall be denied as to Pagliaroni's allegation that DC retaliated against her by terminating her; however, summary judgment shall be granted as to all of Pagliaroni's other allegations of retaliation. Summary judgment shall also be **granted** as to

Pagliaroni's constructive discharge claim. Finally, DC's motion for summary judgment shall be **denied** as to DC's argument that Pagliaroni waived claims by omitting them from her ERD complaint.

In summary, the following claims remain for trial:

1. Whether Pagliaroni is disabled under the Americans with Disabilities Act.

2. If Pagliaroni is disabled, whether Daimler Chrysler failed to reasonably accommodate Pagliaroni's disability.

3. Whether Daimler Chrysler retaliated against Pagliaroni by terminating her after she sought an accommodation under the Americans with Disabilities Act.

A telephone conference with counsel is scheduled for **Wednesday, October 4, 2006** at **9:30 a.m.** to discuss further proceedings in this case. The court will place the call.

Dated at Milwaukee, Wisconsin, this 15th day of September, 2006.

s/AARON E. GOODSTEIN
United States Magistrate Judge